## HAMMOND *v.* FRANKLIN.

*(Circuit Court, S. D. New York.* January 10, 1885.)

1. PATENTS FOR INVENTIONS—REISSUES—ENLARGEMENT OF CLAIMS—WHEN ALLOWABLE.

     An inventor may, after two or three months have elapsed since the issue of an original patent to him, proceed to obtain by a reissue enlargement of claims to cover parts of the invention described but not claimed in the original, especially when this does not appear to be done to cover the progress of other inventions; but an inventor cannot, at *any time*, take out a valid reissue for an invention not shown in the original, in some manner, so as to be discernible therein.

2. SAME—REISSUE No. 3,119, CLAIMS 3 AND 4—PRESERVATION OF MEATS, FRUITS, ETC.—VALIDITY.

     The invention described in the third and fourth claims of reissued letters patent No. 3,119, dated September 15, 1863, granted to William Davis, assignor, for improvement in preserving meats, fruits, etc., the original of which was No. 78,932, dated June 16, 1868, is a different invention from that described in the original, and to that extent, the reissue is void.

In Equity.

*Livingston Gifford,* for orator.

*Charles Levi Woodbury,* for defendant.

WHEELER, J.   This suit is brought for alleged infringement of reissued letters patent No. 3,119, dated September 15, 1868, granted to William Davis, assignor, for improvement in preserving meats, fruit, etc., the original of which was No. 78,932, dated June 16, 1868. The alleged infringement consists in the use of refrigerator cars made according to the specifications of letters patent No. 244,676, dated July 19, 1881, granted to William Scott, for a refrigerating chamber, and letters patent No. 248,738, dated October 25, 1881, granted to Edward Hamilton, for improvements thereon.   Lack of novelty, differences between the original and reissue, and non-infringement, are set up and relied upon as defenses.

The original patent described a car-body constructed of three separate compartments, one within the others, with open spaces all around between them, filled with poor conductors of heat, and an ice receptacle inside the inner compartment, consisting of a double wall, "extending from the bottom to the top" of the compartment, and having funnels, extending upward through the roof, to contain the freezing mixture to be filled in through the funnels, and closed air-tight, except where there were funnels, and they were provided with caps to close them as tightly as was practicable.   The ice receptacle was provided with a goose-neck trap for carrying off water, which would collect in the lower part, without admitting air.   Access to the inside of the car was provided for through hatchways in the roof, made to be practically air-tight, for discharging freight at way stations, without letting out the cold and heavy air to be replaced by warm air, and, through doors in the side, made air-tight in a similar manner for use

at the beginning and end of the journey. The drawings and model showed the ice receptacle extending around the inside of the car at a little distance from the walls, and the model showed it standing on the floor and extending upward to the ceiling. Whether the drawings showed it as standing on the floor or suspended a little above it, and as reaching to the ceiling between the funnels or stopping a little below, is a matter of controversy. Nothing was said about producing currents, anywhere in the inner chamber, for equalizing the cold; nor about freezing the moisture from the air to produce dryness and purity. The leading idea seems to have been to produce cold air within, and retain it by excluding external warm air, and protecting it from radiation by non-conducting sides.

The claims were for the construction of a car-body, room, box, or chest, provided with the compartments between the sides, ice receptacles, funnels, and hatches, arranged and operating substantially as described and for the purposes set forth; and for the goose-neck trap in combination with the receptacle and compartments, arranged substantially as and for the purpose set forth. On the fifteenth of August, Davis filed another application for a patent for an improvement in preserving meats, fruits, fish, etc., consisting of a box, room, chest, or car-body of any size or shape desired, with another box inside sufficiently small to allow an air space all around it, and the inside of the inner box covered with wool or felt, and the whole lined with galvanized iron or zinc, or other appropriate material, making it watertight, and forming a receptacle for the article to be preserved. Inside this was to be placed a rectangular or other properly shaped receptacle, within which to place ice and salt or other freezing mixture, which might extend around the entire box; be placed across one or both sides or ends or in the middle as might be desired; closed on all sides and at top and bottom, except small opening or openings for putting in ice, provided with covers as described in his former patent; and provided with a goose-neck to carry off the drippings arising from the melting ice. He stated that it was a fact beyond question that the moisture of air was what tended to produce decomposition; that he did not propose to preserve the contents of his boxes or cars by simply reducing the atmosphere in which they were confined to as near a freezing point as possible; that neither did he wish to introduce fresh air upon the principle that confined air becomes foul, especially when the articles confined in it are constantly throwing off moisture; that it was this introduction of fresh air into refrigerators that prevented their contents from being preserved but a short time; that he designed to preserve the contents of his boxes or cars "by having the air space next the outside of the same so arranged that the air in the said space is still at all times;" and that then, by the arrangement of the other parts, as before described, with the air confined in the preserving receptacle, no matter how full of moisture, he would congeal the moisture upon the inner metallic walls of the re-

ceptacle, thereby rendering it perfectly pure and dry, so that decomposition would be postponed for a long time. He claimed congealing the moisture in the air, confined in boxes, chests, rooms, or cars, upon the inner walls of the same, substantially as described; the ice receptacle placed entirely around, across either end or side, or at any other point in the preserving chamber, when operating substantially as and for the purposes set forth; and the hatchways or doors in connection with a box, room, chest, or car for the purposes specified. He was advised by the department that his patent anticipated the leading features of his claim, and that if he desired to avail himself of the protection afforded by the patent laws he should seek it by a reissue. He thereupon abandoned that application and obtained leave to withdraw the model, with a view to filing it in an application for the reissue of a former patent for the same invention.

Application was made for the reissue, and it was granted as it is in suit, but upon what communications between him and the department does not appear. In the reissue the construction of the car itself, with its compartments, is the same in all respects as in the original. The ice receptacle is the same, except that in the reissue it is described as extending from near the bottom of the chamber, but leaving a space between it and the bottom of the chamber, to the top of the chamber; and that its sides are slightly inclined or tapering from the top to the bottom, so that the bottom is less in area than, the top. This is stated to be an essential feature to the complete and successful operation of the invention, for the inclined sides will keep the melting ice in close contact with them, causing the moisture to be frozen upon them as long as any ice remains, and it is added that the walls may be "perpendicular or equilateral," but that the inclined sides are preferred, as best in effect. One drawing shows the ice receptacle, with inclined sides near a side or end of the inner chamber, raised from the floor and extending to the top of the chamber. It is stated in the specification that by the arrangement of the ice receptacle, in and with relation to the chamber, as shown, only a thin film of air lies between the top of the receptacle and wall of the chamber; that the air in this thin space is colder than in any other portion of the chamber, and hence there is a current or circulation of the air from the thin space between the top of the receptacle and wall of the chamber downward and under the receptacle into the space in the chamber between the ice receptacle and the opposite wall, until the whole air in the chamber is at the same temperature. This is all that is said in the specification, apart from the claims, about the production of currents for equalizing temperature. This thin space and its film of air is treated on both sides of the case as being between the upper surface of the ice receptacle and the ceiling of the chamber, so that the falling of the cold air would create a current over the top and down behind the receptacle; but such does not appear to me to be the case. The receptacle is described and shown

everywhere as extending to the top of the chamber; the current is described as being downward and under, but not over the receptacle; and the third claim, which is framed upon this part of the specification, is for the receptacle "so constructed and arranged as to be pendent from the inner upper wall" of the chamber, "and allowing a free circulation underneath the receptacle, and on all sides, substantially as described." The thin space would seem to be between the projecting top of the inclined side of the receptacle and wall. The descending cold air would be replaced by currents around the ends and along the sides of the receptacle, and would thus pass under it, and thereby fill the whole description, and not contradict any of it.

The first two claims of the reissue are the same as the two claims of the original. There are two others in the reissue: the third being as just stated; and the fourth is for the construction and relative arrangement of the ice receptacle with the chamber, whereby the moisture in the chamber is frozen to the walls of the receptacle, substantially in the manner and by the means described. The defendant does not have the construction, arrangement, or combination of either of the claims of the original patent, and infringement of the two new claims only is relied upon. The claims of the original are enlarged in the reissue, and the suit rests upon the enlargement. But little more than two months, and less than three, elapsed between the date of the original and the application 'for the reissue. This does not seem to be too long a time to take, before proceeding for an enlargement of the claims to cover parts of the invention described but not claimed in the original, especially when not shown to be done to cover the progress of other inventors. The decided cases appear to warrant this course. *Miller* v. *Brass Co.* 104 U. S. 352; *James* v. *Campbell,* Id. 371; *Clements* v. *Odorless Apparatus Co.* 109 U. S. 641; S. C. 3 Sup. Ct. Rep. 525; *Hartshorn* v. *Eagle Shade Roller Co.* 18 FED. REP. 91. But where the reissue is for an invention not shown in the original, or a different one from that shown there, neither promptitude nor delay in making application for the reissue would seem to make any difference. It is understood that an inventor cannot at any time take out a valid reissue for an invention not shown in the original, in some manner, so as to be discernible there. *Gill* v. *Wells,* 22 Wall. 1; *Russell* v. *Dodge,* 93 U. S. 460; *Manufacturing Co.* v. *Ladd,* 102 U. S. 408.

The evidence tends to show that Davis made a refrigerating apparatus, showing the principle of these new claims, and of the alleged infringement, prior to his application for the original patent; and it is urged that this shows that the invention which he undertook and intended to patent included the same thing, and that the reissue is for the same invention. The same thing was done in *Manufacturing Co.* v. *Ladd, supra;* and the court said that if it were true, it would be nothing to the purpose; that there was no safe or just rule but that which confines a reissued patent to the same invention which

was described or indicated in the original. It is also urged that the action of the patent-office, in suggesting an application for a reissue when the application for a new patent was made, should have weight in upholding the reissue. But that application was for a patent for a different invention from that to which the new claims of the reissue are applicable. That was for an arrangement to have the 'air still; this, for having it in circulation; therefore, if a new invention was taken into the reissue, it was not that, and the suggestion, if it would have any weight when acted upon, was not acted upon for this purpose. Upon this question, the original patent as it was made, not as it might have been made, is to be compared with the reissued patent as it is. Now, the invention sought to be covered by these new claims consists, essentially, in the production of circulation of the air about the ice receptacle, by the falling of the cold and heavy air behind it and passing under it to replace the warmer air taking the place of the falling cold air, and the freezing of the moisture taken by the warmer air from the articles to be preserved to the surfaces of the ice receptacle as it passes them. The original patent does not mention this operation nor this result. If the ice receptacle was raised from the floor, so as to make an air passage under it, this result would be produced. It would, doubtless, be well enough if the patent showed the parts arranged to produce the result, without saying expressly that they would produce it.

It is an important question, therefore, whether the original patent shows the ice receptacle so raised from the floor of the compartment. It is described as extending from the bottom to the top of the compartment. The model shows it resting on the floor of the compartment. The drawing shows nothing to support it raised. Figs. 2 and 3 of the drawings show cross-sections of it touching a line at the bottom. It is not clear what that line is intended to represent; if the floor, then the drawing shows the receptacle resting on the floor; if another part of the receptacle, then it may show it raised. But the cross-sections of the structure are not at such points that there would be no part of the receptacle there to be represented by this line. The drawings themselves are ambiguous on this point, and do not appear to be sufficiently clear to control the expressions of the specifications and model. Probably no one, not even of those skilled in the art or science to which this invention appertains, would read the specifications, examine the model and drawings, without taking any suggestions from without them, and perceive any invention there depending at all upon a passage for air under the ice receptacle. Certainly, what the inventor delivered was not a written description of an invention or discovery covering such device, in such full, clear, and exact terms as to enable any person so skilled to construct and use it, as required by the statute under which the patent was granted. Act 1836, § 6, (5 St. at Large, 117.) The conclusion follows that the invention described in the reissue, and that part of it relied upon, is a different

invention from that described in the original; and that, to this extent, at least, the reissue is void. Let a decree be entered, dismissing the bill of complaint, with costs.